UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

MORGAN CHAMBERS

Case No. 3:25-cr-261-HES-PDB
18 U.S.C. § 371
(Conspiracy to Commit
 Marriage Fraud)

## INFORMATION

The United States Attorney charges:

### COUNT ONE
**(Conspiracy to Commit Marriage Fraud)**

**A. Introduction**

At times material to this Information:

1. The Immigration and Nationality Act ("INA") governed the immigration laws of the United States.

2. Pursuant to the INA, non-citizens of the United States ("aliens") generally were not permitted to permanently reside in the United States unless they were lawful permanent residents ("LPRs").

3. A United States citizen seeking to assist a relative who was an alien in obtaining LPR status in the United States was required to file United States Citizenship and Immigration Services ("USCIS") Form I-130, Petition for Alien Relative.

4.  An alien seeking to obtain LPR status in the United States was required to file USCIS Form I-485, Application to Register Permanent Residence or Adjust Status.

5.  When a United States citizen filed a Form I-130 petition for an alien spouse, a visa could be immediately available to the alien spouse upon the approval of Form I-130, because the spouse was an immediate relative.

6.  Immediate relatives had special immigration priority and did not have to wait in line for a visa number to become available for them to immigrate because there were an unlimited number of visas for spouses of United States citizens.

7.  An immediate relative relationship generally allowed the alien spouse to apply on Form I-485, Application to Register Permanent Residence or Adjust Status, to become an LPR either at the same time or subsequent to their United States citizen spouse filing Form I-130, Petition for Alien Relative.

8.  Once USCIS approved an alien for LPR status, the agency issued the alien an LPR card (Form I-551 or "green card"). The LPR card authorized the alien to lawfully reside and work in the United States.

### B.  The Conspiracy

9.  Beginning in or about September 2024, and continuing through in or about February 2025, in the Middle District of Florida, and elsewhere, the defendant,

MORGAN CHAMBERS,

did knowingly and willfully conspire, combine, confederate, and agree with other persons known and unknown to the United States Attorney, including individuals referred to herein as Conspirator-1, Conspirator-2, Conspirator-3, Conspirator-4, and Conspirator-5, to commit an offense against the United States, specifically engaging in marriage fraud in violation of 8 U.S.C. § 1325(c).

### C. The Manner and Means

10. The manner and means by which the defendant and her co-conspirators carried out the conspiracy in the Middle District of Florida and elsewhere included, among other things:

   a. It was part of the conspiracy that the conspirators attempted to recruit, and did recruit, U.S. citizens to join the conspiracy and marry conspirator aliens, specifically, Chinese nationals, for the purpose of evading immigration laws and illicitly obtaining beneficial immigration status for the Chinese nationals.

   b. It was further part of the conspiracy that the conspirators preferred to recruit U.S. citizens who were members of the U.S. armed forces – like the defendant – to join the conspiracy and marry Chinese nationals.

   c. It was further part of the conspiracy that the conspirators would offer to pay, and did pay, U.S. citizens to marry Chinese nationals.

   d. It was further part of the conspiracy that the conspirators would offer to pay, and did pay, the travel expenses of U.S. citizen conspirators who traveled to marry Chinese national conspirators.

  e. It was further part of the conspiracy that the resulting marriages between U.S. citizen conspirators and Chinese national conspirators were a sham and not true marriages.

  f. It was further part of the conspiracy that the conspirators would photograph the couples who were a party to these sham marriages, including during the marriage ceremonies, in an effort to create evidence that could be presented to immigration authorities to suggest that the marriages were legitimate, and the couples were in loving, committed relationships.

  g. It was further part of the conspiracy that the conspirators would rely on the sham marriages as a basis for petitioning immigration authorities (by filing Forms I-130, I-485, or both) for the Chinese nationals to become lawful U.S. residents and obtain LPR cards or green cards.

  h. It was further part of the conspiracy that the conspirators sometimes used encrypted applications to communicate with each other regarding the conspiracy.

  i. It was a further part of the conspiracy that the conspirators would perform acts and make statements to hide and conceal, and cause to be hidden and concealed, the purposes of the conspiracy and the acts committed in furtherance thereof.

### D. <u>Overt Acts</u>

11. In furtherance of the conspiracy, and to effect the objects thereof, the following overt acts, among others, were committed in the Middle District of

Florida, and elsewhere:

    a. On or about September 13, 2024, Conspirator-1 recruited the defendant, a U.S. Navy servicemember, to enter a sham marriage.

    b. On or about September 13, 2024, using a group chat on an encrypted messaging application, Conspirator-1 introduced the defendant to Conspirator-2.

    c. On or about September 13, 2024, as part of the same group chat, Conspirator-2 told the defendant that as part of the marriage fraud scheme, she would be paid $10,000 up front, $20,000 when a "green card" was obtained for her future, nominal husband, and $5,000 when the divorce was settled.

    d. On or about September 17, 2024, as part of the same group chat, Conspirator-2 sent the defendant a photo of a Chinese national (Conspirator-3), explaining that Conspirator-3 would be her "counterpart," that is, her future, nominal husband.

    e. On or about October 4, 2024, the defendant and Conspirator-1 travelled from Jacksonville, Florida to Las Vegas, Nevada, so that the defendant could marry Conspirator-3 there.

    f. On or about October 4, 2024, in Las Vegas, the defendant met Conspirator-3 for the first time and married him that day.

    g. On or about October 4, 2024, in the restroom of a Las Vegas restaurant, Conspirator-4 paid, and the defendant accepted, $10,000 in cash for marrying Conspirator-3.

      h.      On or about February 8, 2025, Conspirator-2 told a confidential source who was working with law enforcement (CS-1) that he and his wife (CS-2) could be paid $35,000 each to enter fraudulent marriages.

      i.      On or about February 13, 2025, Conspirator-2 met with CS-1 in person in Jacksonville, Florida. Among other things, Conspirator-2 told CS-1 that, as part of the marriage fraud scheme, he and CS-2 could be paid $35,000 each to get married, with $10,000 up front.

All in violation of 18 U.S.C. § 371.

GREGORY W. KEHOE
United States Attorney

By: *[signature]*
DAVID MESROBIAN
Assistant United States Attorney

By: *[signature]*
MICHAEL J. COOLICAN
Assistant United States Attorney

By: *[signature]*
DANIEL J. MARCET
Assistant United States Attorney
Chief, National Security Section